(C. D. 1488)

HARRY HARRIS & Co. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 18, 1952)

*Barnes, Richardson & Colburn* (*Eugene F. Blauvelt* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*Richard H. Welsh*, special attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: In this case eight protests enumerated in schedule "A," attached to and made part of this decision, were consolidated for trial.

Certain imported merchandise was classified by the collector of customs as steel sheets, valued at more than 3 cents per pound, as provided in paragraph 308 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 308), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and duty was imposed thereon at the rate of 10 per centum ad valorem. An additional assessment of one-tenth of 1 cent per pound was also levied pursuant to the provision for galvanized steel sheets in paragraph 309 of said act (19 U. S. C. §1001, par. 309), as modified, *supra*.

It is the contention of plaintiff that the importations in controversy are entitled to entry free of duty as scrap in accordance with the provisions of Public Law 497, 77th Congress, as amended by Public Law 869 of the 81st Congress (Second Session).

The competing provisions of law are here set forth:

Paragraph 308, Tariff Act of 1930, as modified by T. D. 51802:

Sheets of iron or steel, common or black, of whatever dimensions, and skelp iron or steel:

   \*       \*       \*       \*       \*       \*       \*

      Valued at more than 3 cents per pound_____10% ad val.

Paragraph 309, Tariff Act of 1930, as modified by T. D. 51802:

All iron or steel sheets, \* \* \* when galvanized \* \* \* \_\_\_\_ 1/10¢ per lb. more duty than if the same was not so galvanized or coated

Public Law 869 (footnote to T. D. 52656, advance sheets Treasury Decisions February 1, 1951, p. 4) (86 Treas. Dec. 27):

"\* \* \* 'Sec. 1. (a) No duties or import taxes shall be levied, collected, or payable under the Tariff Act of 1930, as amended, or under section 3425 of the Internal Revenue Code with respect to metal scrap, or relaying and rerolling rails.

'(b) The word "scrap", as used in this Act, shall mean all ferrous and non-ferrous materials and articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured.'

   \*       \*       \*       \*       \*       \*       \*

"Sec. 2. The amendment made by this Act shall be effective as to merchandise entered, or withdrawn from warehouse, for consumption on or after the day following the date of the enactment of this Act and before the close of June 30, 1951. It shall also be effective as to merchandise entered, or withdrawn from warehouse, for consumption before the period specified where the liquidation of the entry or withdrawal covering the merchandise, or the exaction or decision relating to the rate of duty applicable to the merchandise, has not become final by reason of section 514, Tariff Act of 1930."

While it is claimed by plaintiff that the imported commodity is scrap within the purview of Public Law 869, *supra*, defendant asserts that the evidence fails to establish that the steel sheets are in fact scrap and affirmatively proves that said sheets are galvanized.

At the trial, the testimony of Harry Reynolds of H. L. Reynolds, Ltd., Old Leeds Steel Works, England, taken by means of a commission duly issued by the court was received in evidence as exhibit 1. Another document containing the questions and answers of the witness, Reynolds, in seriatim form was received and identified as exhibit 2. Said commission pertains to the merchandise involved in the first six protests enumerated in schedule "A," *supra*. At the trial, it was stipulated that the merchandise the subject of the other two protests, 168238–K and 169466–K, also appearing on said schedule "A," was the same in all material respects, came from the same source, and was subjected to the same treatment in England as was the balance of the merchandise here in controversy.

Reynolds testified to his personal familiarity with the imported steel sheets which were sold and exported by his company to Harry Harris & Co., plaintiff herein. The substance of his testimony is that he is managing director of H. L. Reynolds, Ltd., and has been engaged in the steel material business for over 20 years, handling new and secondhand iron and steel machinery, and during the past 4 years, he has dealt exclusively in galvanized sheets. He stated that the subject merchandise was purchased from Iron and Steel Disposals, Ltd., a Government-sponsored company formed by the British Government for the purpose of disposing of surplus war material; and that when he first saw the merchandise, to quote the witness—

\* \* \* It was in the form of Anderson Air Raid Shelters—they were mostly erected in back gardens of private houses and these had been issued to the people by the British Home Office authorities and these were recommended by the authorities to be sunk into the ground almost completely and banked up with dirt and earth to give occupants protection from bomb blast. Finally when I became interested in the Leeds County Borough Engineer's Depot where they had been collected from householders after the war was over.

That is where I first saw them in bulk at the Leeds Depot. (But they were held in similar depots of local authorities in England, Scotland and Wales).

\* \* \* \* \* \* \*

All the sheets were corrugated. The largest proportion of these were bent in almost a half-moon shape, which when bolted together formed an arch. These had been recommended by the authorities to be sunk almost wholly in the ground and covered with dirt and clay which had a tendency, together with the atmospheric conditions, to cause the galvanizing to peel from the sheets, and almost without exception the galvanizing was wholly absent for a depth of up to six inches from one end of the sheet at both sides and again almost without exception there were also rusted patches on the outside of the sheet. They were mostly good on the inside, but where the weather and soil and so forth—atmospheric conditions, sea air conditions—it had peeled off the galvanizing.

They had bolt holes in, of course.

The witness admitted that the sheets had originally been galvanized but that "It was very unusual to find even an odd sheet wholly where the galvanizing had not been attacked and where there were not any rust patches"; that he purchased the sheets as second-hand material; that, when purchased, the sheets were bent "and we had to straighten them by mechanical means and then flatten and roll out the corrugations to make them into a flat sheet." Apparently this was done to make the material less bulky and less expensive to transport to the United States.

With particular reference to the process of flattening the curved sheets, the witness gave the following testimony:

The action of the straightening and flattening processes caused the coating of galvanizing to flake and peel from the steel sheets. The fact of them being galvanized when they were first made was to a great extent a deterrent on sales and they could not be offered as a galvanized sheet as such because of damaged galvanizing and rust patches. We removed the corrugations in the sheets by cold rolling and this, of course, did have a further effect of breaking and cracking the galvanizing coat which still remained on the sheet, and in fact on my part they were only described as galvanized so that I could not be accused of misrepresenting the sheets, and in some cases we did have these sheets pickled to remove the galvanizing as they were a much better proposition on the sales side in that condition. This, of course, occurred after the sales to Harry Harris when we began to find that the market was drying up for this material and we found sales were slackening off, and in fact all the way through in our sales of this material galvanizing was a greater disadvantage to sales of the sheets than an advantage.

Plaintiff then introduced the testimony of Harry Harris, president of the plaintiff company, with which he had been associated some 40 years, engaged in iron and steel scrap, and in the new and second-hand steel products business.

It appears from the record that Harris went to England, visited Harry Reynolds of the H. L. Reynolds, Ltd., above referred to, for the purpose of negotiating the purchase of the imported material; that he saw the sheets both before and after they were subjected to the rolling process described by Reynolds, a process which was necessary to place the sheets in convenient form for shipping, and which also rendered them more salable.

Harris testified that after importation into the United States, the merchandise received his personal attention, and that "* * * we sold very large tonnage of it to the General Motors Corporation; we sold considerable tonnage to the Chrysler Corporation; we sold some of that to another dealer in Detroit, Michigan, United Steel Sales."

It is significant, however, that Harris did not sell the subject merchandise in its condition as imported. When interrogated as to what was done with the merchandise after importation and before its sale in this country, the witness gave the following testimony: "We perfected a rolling machine having circular steel brushes, one reversing the other"—the brushes being made of steel wire. "We didn't exactly invent it, we created it. We discovered that by first building a small machine to run through a series of these wire brushes that we were able to take off the dirt and clean up the sheet to such an extent that it would possibly make it saleable to the General Motors Company"; that the machine cost "Around $70,000"; and that "* * * we had to put in considerable amount of installations such as electrical apparatus, tractors, we had to repair the floor which had no foundation whatsoever. We had to put in two dust collectors to absorb the dust and dirt as we cleaned the steel. All in all, that cost us in the neighborhood of $85,000, including the dust collectors"—the total cost being $155,000.

The witness testified that the primary purpose of running the sheets through the brushing machine "was to remove the considerable amount of dirt on them. In that process you just couldn't help but remove the part of the galvanizing that was on the sheet. It went through the series of rolls we had, we had 30 rolls. The reason for having that many was to run that sheet and get production and we had something like 1,800 revolutions per minute. The friction there couldn't help but take off some of the galvanizing from the sheet." It also removed rust and dirt.

In addition to the brushing process above described, he stated— "We had to cut off the ends where the bolt holes were. That took about 15 per cent of the total weight per sheet. Then where we had extremely rusted spots or badly corroded galvanizing, we had to cut that out so that it would resemble something similar to a half-way decent sheet." The cutting process was performed with electric steel shears. The dimensions of the sheets were stated to be "anywhere from 29 to 31½ inches wide. They ran from 60 inches to 90, about 90 inches long," in thickness from 13 to 15 gauge. It appears that new steel sheets "run from stock sizes such as 36 by 96; 24 by 96; well, 24, 36, and 48 by 96; 120, and 144 inches long."

Harris testified that the steel sheets after being processed as above described would not constitute a good delivery for galvanized sheets and that in their condition as imported "the only use I could con-

sider them at all for was for remelting purposes." It is also noted that the plaintiff company does from 12 to 14 million dollars worth of business in scrap material annually.

Harris stated that he had visited several large steel mills and was familiar with the method by which scrap material was utilized by remelting; that about 25 per centum of the importations in controversy "went into the steel scrap mixed with our other steel scrap." However, it appears that of the 2,500 tons of these sheets which were sold to General Motors Corp., 2,000 tons were returned because the material was unsatisfactory and it was unable to use it because of certain inherent defects; that while the sheets were sold to the corporation at $154 a ton, they were repurchased by plaintiff at $13.85 per net ton. Plaintiff also had complaints from other companies and, in an attempt to have the condition of the sheets changed—

We had the material de-galvanized. In other words, pickling, which galvanized the material, we had it reheated, rerolled, and yet we were unable to do anything with the material.

The witness stated that it was impossible to make commercial sheets out of the material.

Harris also testified that "We were not able to find a market for this material to be utilized in its original form and as a result of that, we had advised [sic] through the mediums of the trade for weeks and weeks at a time the response was almost nil, very, very discouraging and finally the scrap market took a boost. * * * This was 1949. During all this time the market on scrap steel had gone down from something like $40 a ton to $15 a ton; that was why this scrap was bought from General Motors at $15. In the space of about one year's time the scrap market had then gone up from the $15 price to around $35." He eventually got $28 a ton for some of it and $35 a ton for the balance.

The witness testified further that the material cost $135 a ton. He stated that when shipping some of this material after the rusted pieces had been cut off and the rust and galvanizing cleaned away, the merchandise was shipped by rail freight in the United States. In order to properly designate the material for rail shipment, he called in the Eastern Weighing and Inspection Bureau, so that he might ascertain its proper classification. He was advised to classify this material as cropped ends, "which is practically scrap iron and steel." He described "cropped ends" as the ends or crops of new steel which are put back into the furnaces for remelting purposes.

On cross-examination, Harris testified that he purchased the importation with the thought that he might sell it as sheets and that he did not buy it as scrap. Prior to purchase, the sheets were rerolled primarily to flatten them for shipping purposes.

The witness testified that for final resale purposes, the merchandise was advertised "for purposes of description without misrepresentation," as "a used galvanized sheet, 13 to 15 gauge which means that the material was hard steel and if they wanted to buy them for that purpose all right, but under no circumstances did we make a sale of this material unless the representative of the purchaser came to our plant and personally inspected the material and when he saw it, we asked him no questions when he gave us an order." The price on resale ran from $28 to $35 a ton which price indicates "practically scrap."

On redirect examination, the witness stated that the cutting off of bolt holes and rust spots from the sheets resulted in scrap amounting to 20 per centum of the imported tonnage (or 1,200 tons), which was sold directly to steel companies.

In answer to a question from the bench, the witness stated that all the merchandise sold to General Motors Co. and to the Chrysler Corp. was treated after arriving in this country and none was sold to them in the condition as imported. At the time of importation, the merchandise would not compete with commercial galvanized sheet steel.

The primary question for our determination is whether or not the merchandise in controversy at the time of importation consisted of "scrap," within the meaning of Public Law 869, *supra*. What may have been done to the merchandise subsequent to importation in order to put it in a salable condition as steel sheets can have no bearing on its classification. (*United States* v. *International Forwarding Co.*, 15 Ct. Cust. Appls. 198, 200, T. D. 42235.) As was stated in *Worthington* v. *Robbins*, 139 U. S. 337, "In order to produce uniformity in the imposition of duties, the dutiable classification of articles imported must be ascertained by an examination of the imported article itself, in the condition in which it is imported."

It is apparent from the record before us that at the time of purchase of the material in issue as well as subsequent to its importation into this country, it was the intention to deal in the commodity as steel sheets. When it was realized upon importation that there was not a market for the importation as sheets, the importer went to considerable expense in order to process the merchandise for that purpose. However, the record indicates that the material, even when reconditioned, was too brittle for use as steel sheets and after the cancellation of their orders by the General Motors Co. and the Chrysler Corp., the merchandise was disposed of as "scrap." It is further apparent that the merchandise in the condition as imported was nothing more than scrap fit only to be remanufactured.

Regardless of what might have been the hopes of the importer or what its intentions were at the time of purchase, the test to be applied

to classification is what in fact was the merchandise at the time of importation into the United States.

In the case of *The Robert Edwards*, 6 Wheat. 187 (19 U. S. 85), it was stated by the Supreme Court of the United States that "we are not to shut our eyes on circumstances, which sometimes carry with them a conviction, which the most positive testimony will sometimes fail to produce."

From all the facts and circumstances presented by the record before us, we are of the opinion that at the time of importation, the merchandise, the subject of this case, was encompassed by the definition of "scrap" contained in section 1 (b) of Public Law 869, *supra*, namely, "all ferrous and nonferrous materials and articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured."

The claim of plaintiff for free entry of the merchandise within the provisions of said public law is, therefore, sustained.

Judgment will be entered accordingly.