BEFORE THE SECOND DIVISION, NOVEMBER 18, 1954

**No. 58516.**—New York Foil Product and Schmidt Pritchard & Co., Inc. *v.* United States, protest 191507–K (New York).

LAWRENCE, Judge:   Certain merchandise described as "aluminum foil clippings" on the consular invoice accompanying the entry covered by the protest herein was classified by the collector of customs as "aluminum foil less than six one-thousandths of one inch in thickness" within the scope of paragraph 382 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 382) and duty was assessed thereon at the rate of 40 per centum ad valorem.

The claim relied upon by plaintiffs is that the merchandise should have been classified as metal scrap and granted entry free of duty as coming within the provision in Public Law 869 of the 81st Congress reading—

Sec. 1. (a)   No duties or import taxes shall be levied, collected, or payable under the Tariff Act of 1930, as amended, or under section 3425 of the Internal Revenue Code with respect to metal scrap, or relaying and rerolling rails.

(b) The word "scrap", as used in this Act, shall mean all ferrous and nonferrous materials and articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured.

On behalf of plaintiffs, Joseph Eisen was called and testified in substance that he was the owner of the real company in interest and had been doing business since 1938, buying "all kinds of foils and converting from rolls to sheet, and cutting and slitting, and so on"; that the kinds of foil he dealt in were household and wrapping foil, composed of aluminum, from which he made ornaments for Christmas items; that, since 1938, he had bought aluminum foil in the United States mostly in the form of scrap—"I am buying from mills what is left over, odd lots, and so on."

Eisen testified to his familiarity with the importation in controversy, and that prior to the purchase of it he visited the manufacturer's place of business in Germany; "I was there because we couldn't get here any domestic goods when the war started with Korea, so I went over there and I bought what I could."   He went through the plant in Germany, saw the stock in rolls from which merchandise like that he imported was produced as "cut-offs" in trimming rolls to desired widths.   He testified that in making aluminum foil "They roll it from heavy gauges and re-machine it for fine gauges and then it comes out in widths about 28 inches or so, and sometimes 36, and they trim it because it doesn't come uniform on the edges."

The witness produced a small paper bag containing pieces of foil in various sizes which he stated came out of the importation in controversy.   These samples were received in evidence as collective exhibit 1.   Eisen testified that the shipment consisted of 3,500 pounds and, in a period of 2 years since this importation, he had sold about 152 pounds at 12 cents a pound, f. o. b. New York, which was approximately the market price for aluminum foil scrap; that it was his understanding that this small quantity which he had been able to sell had been remanufactured into aluminum powder; that during the 2-year period he had been unable to find any use for the product other than for remanufacture; that he could not sell it as wrapping material "because it has trim holes."   When asked

if it could be used in wrapping candy, he replied "No, sir. They use rolls with the machines and then this is too small, it has pinholes, it has to be 100 percent, otherwise it is no good."

On cross-examination, Eisen testified that he bought the foil in controversy and paid approximately 25 cents a pound for it and when asked if that was a "scrap price," he replied "No"; that he had bought it as a job lot in clippings which were "packaged according to their respective sizes in separate rolls"; that he had sold merchandise similar to collective exhibit 1 as scrap and that he had paid 2 cents and 5 cents a pound for such merchandise. He stated that he paid 27 cents for the imported merchandise "Because I couldn't get it when the Korean war started. They started delivering all kinds of material, everything went for war purposes, and I received from our suppliers a letter that they wouldn't be able to send any goods for a year or so, so I should get imported goods."

Further, on cross-examination, Eisen insisted that he had purchased the merchandise here in controversy as aluminum clippings, "What is left over, irregular trim."

As imported, the commodity was in 10-pound packages made up of smaller packages, each small package consisting of individual colors, collective exhibit 1 being a composite sample.

Defendant called Fred C. Guerriero, a customs examiner employed in the office of the appraiser of merchandise at New York. At the time of importation, he examined and advisorily classified the merchandise for duty and at that time saw one 10-pound package. The package which he examined was composed of a solid green color of foil. Two small "squares," identified by Examiner Guerriero, were received in evidence as collective exhibit A. An examination of these two pieces discloses that they have been irregularly cut or slit in various places.

The witness stated that collective exhibit A was representative of the foil in the 10-pound package which he received for examination. When asked what is the price of aluminum foil less than six one-thousandths of an inch in thickness, the witness stated that "* * * at that time foil in the same shape as brought in by other importers, they paid maybe $1.80 or $1.90 a pound" for it, which statement was later corrected to read $1.80 or $1.90 per kilo.

The merchandise was entered at the invoice price of 60 cents per kilo (the price the importer paid to the German manufacturer), which was equivalent to 26 or 27 cents a pound, and the merchandise was appraised at the entered value. Obviously, therefore, the imported merchandise was regarded as of an inferior quality.

The issue herein is not unlike in principle that presented in the case of *Harry Harris & Co.* v. *United States*, 29 Cust. Ct. 331, C. D. 1488, which is the only analogous reference cited in the brief of plaintiffs herein. In that case, we held that certain surplus war material, which had been used in the construction of air-raid shelters in England, and consisted of steel sheets which in their original form had been galvanized but through the action of atmospheric conditions and other causes had lost their identity as galvanized sheets, was entitled to free entry pursuant to Public Law 869, *supra*, for the reason that, as imported, the sheets were so defective and damaged they were fit only to be remanufactured.

Defendant, in its brief, also cites the *Harris* case, *supra*, in the following statement—

The law is well settled that for merchandise to be considered scrap within the purview of Public Law 869, *supra*, in its imported condition it must be fit only for remanufacture *by remelting*, citing *Harry Harris & Co.* v. *United States*, 29 Cust. Ct. 331, C. D. 1488. [Italics quoted.]

We find nothing in the *Harris* case to support this statement. Defendant's interpretation of that decision may have resulted from a confusion of the terms

of section 1 (b) and section 2 of Public Law 869. A comparison of the phraseology of the two provisions discloses that section 1 (b), relied upon in the instant case as well as in the *Harris* case, limits the word "scrap" to certain defined products "which are fit only to be remanufactured," whereas section 2 of said Public Law provides for certain articles "imported to be used in remanufacture *by melting*." [Emphasis added.]

The record before us discloses that the witness Eisen had been in Germany at the factory where the product was made and saw how similar merchandise was produced; that it was, in fact, waste or scrap clippings from aluminum manufactured in rolls or sheets; and that it had no use in the United States except for possible remanufacture into aluminum powder. We are, therefore, of the opinion that plaintiffs have made out a *prima facie* case establishing that the importation is scrap material within the purview of section 1 (b) of Public Law 869, *supra*, and, hence, is entitled to entry free of duty, as claimed by plaintiffs. To that extent, the protest is sustained and judgment will be entered accordingly.