(C.D. 2136)

## NATIONAL LEAD COMPANY *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 1, 1959)

*Sharretts, Paley & Carter* (*Joseph F. Donohue* of counsel) for the plaintiff. *George Cochran Doub*, Assistant Attorney General (*Henry J. O'Neill*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: The three protests enumerated in the schedule attached hereto were consolidated for the purpose of trial and determination. The importations to which they relate are briefly described as lead in pigs.

The collectors of customs classified the merchandise in paragraph 392 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 392), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, and duty was imposed thereon at the rate of $1\frac{1}{16}$ cents per pound on the lead content.

Plaintiff claims that said merchandise is entitled to free entry pursuant to the provisions of Public Law 869, 81st Congress, 2d session (64 Stat. 1093), as amended by Public Law 66, 84th Congress, 1st session (69 Stat. 87).

The pertinent text of the competing statutes is here set forth:

Paragraph 392, as modified, *supra*:

Lead bullion or base bullion, lead in pigs and bars, lead dross, reclaimed lead, scrap lead, antimonial lead, antimonial scrap lead, type metal, Babbitt metal, solder, all alloys or combinations of lead not specially provided for_____ $1\frac{1}{16}$¢ per lb. on lead content

Public Law 869 (64 Stat. 1093), was extended from time to time and as extended to June 30, 1956, by Public Law 66 (69 Stat. 87), reads:

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That:*

\* \* \* \* \* \* \*

SEC. 1. (a) No duties or import taxes shall be levied, collected, or payable under the Tariff Act of 1930, as amended, or under section 3425 of the Internal Revenue Code with respect to metal scrap, or relaying and rerolling rails.

(b) The word "scrap", as used in this Act, shall mean all ferrous and non-ferrous materials and articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured.

SEC. 2. Articles of which metal is the component material of chief value, other than ores or concentrates or crude metal, imported to be used in remanufacture by melting, shall be accorded entry free of duty and import tax, upon submission of proof, under such regulations and within such time as the Secretary of the Treasury may prescribe, that they have been used in remanufacture by melting: *Provided, however,* That nothing contained in the provisions of this section shall be construed to limit or restrict the exemption granted by section 1 of this Act.

At the trial, plaintiff introduced collective exhibits 1 and 2 consisting of several affidavits and memoranda designed to establish compliance with the Regulations of the Secretary of the Treasury in an effort to sustain its claim for free entry.

Defendant introduced certain laboratory reports (collective exhibit A) to establish the lead content of some of the importations and also a reprint of the standard specifications of the American Society for Testing Materials (exhibit B). It also introduced a jar of litharge (exhibit C). Plaintiff called two witnesses, the defendant one.

Plaintiff's first witness, Dusan D. Stankovic, was general manager since 1946 of the Yugometal Co. in Belgrade, Yugoslavia. He stated that his duties were to supervise the general activities of the company and its sales of lead ingots to the National Lead Company, and that he was familiar with the importations in controversy referred to on one of the invoices as prime virgin lead Trepca brand, 29,045 ingots.

Prior to 1946, Stankovic was employed by the Trepca Mines and worked in the department having to do with the sale of lead concentrates, zinc concentrates, copper concentrates, and lead metal. He was familiar with the process by which lead ore was mined and the process of converting ores to concentrates, as well as the process of converting concentrates to crude metal which he had observed at Trepca and at refineries. He described the process whereby ore is mined and subsequently treated to produce the imported commodity. After the ore is extracted from the mine, it is crushed "to the size of a fist" and then transported to a flotation plant "where selective floatation process takes place." At that point, the normal content of lead in the ore is about 7 per centum. Also present are 4 per centum zinc, "about 100 grams

of silver per ton, some copper and impurities such as there is some iron, there is some sulphur, of course." The object of flotation is to enrich the ore and make concentrates leading to the production of crude lead.

As stated by the witness, "When the ore comes to the mill, it has been crushed to powder and water is added and inside of the process different reagents are added in order to separate lead concentrates on one side, zinc concentrates on the other, copper concentrates on the other and pyrites." The lead as it comes from the flotation process is in the form of lead concentrates, its composition at that time being about 80 per centum lead, and an increased percentage of silver "about one kilo per metric ton." Then there is an "increased impurity of bismuth" which is later recovered by smelting from the concentrate, and there are certain other impurities, such as small percentages of copper, zinc, iron, and so forth.

From the foregoing evidence, it appears that the lead ingots in controversy are a natural product obtained from the treatment or processing of lead ore. In its native state, lead ore contains various metals and minerals. By means of chemical and physical processes, including flotation, smelting, and refining, lead is divested of its component metals and impurities and ultimately becomes commercially pure lead in the form of ingots which are the subject of this controversy. These ingots are not *manufactures* of lead—they are not manufactures of anything; they are simply native lead brought to a state of purity by the processes above described.

It is the opinion of the court that the facts of this case bring it within the scope of our decision in *United Metal Goods Mfg. Co.* v. *United States*, 41 Cust. Ct. 93, C.D. 2026, affirmed in *Id.* v. *Id.*, 46 C.C.P.A. (Customs) 120, C.A.D. 712. We there held that certain importations, described as " 'zinc aluminum casting metal,' 'zinc metal,' 'zinc,' 'zinc die casting metal,' 'alloy zinc metal,' and 'zinc alloy,' " consisting of metal alloys made pursuant to standard specifications of the American Society for Testing Materials, were not entitled to the benefit of free entry by virtue of Public Law 869, *supra*, either as metal scrap, fit only to be remanufactured, or as articles of which metal is the component material of chief value, other than ores or concentrates or crude metal, imported to be used and remanufactured by melting. It appears that the ingots in that case were known as unbreakable zinc casting metal, composed of 95 per centum zinc and 5 per centum aluminum, with small amounts of lead and copper and possibly magnesium being added to meet certain requirements.

It appeared further that, after importation, said metal ingots, because of their composition, were dedicated to the particular purpose of manufacturing clock frames, giftware, and so forth.

In reaching our conclusion that the metal alloys in that case were not within the scope of Public Law 869, *supra*, we gave special attention to the connotation of the word "remanufacture" in section 2 of that act. We expressed the opinion that merchandise imported for use in remanufacture by melting within the purview of said section 2 had reference to articles which had been previously manufactured, such as surplus war material which had been used in the construction of air-raid shelters in England, the subject of our decision in *Harry Harris & Co.* v. *United States*, 29 Cust. Ct. 331, C.D. 1488, and not commodities such as zinc casting metal ingots "which, although admittedly articles in a broad sense, are still objects of commerce to be subjected to successive manufacturing (rather than remanufacturing) processes before reaching their final status as clockcases and giftware items."

In affirming our judgment in *United Metal*, *supra*, our appellate court referred to the obvious purpose of the enactment of said section 2 "as a war and post-war measure in an endeavor to facilitate access to scrap metal and surplus war material by the United States." The court quoted with approval our interpretation and application of the word "remanufacture" and gave expression of its views in the following terms:

Coming now to the language of section 2 itself, the phrase which demonstrates that this section does not apply to the importations at bar pertains to the requirement of a "remanufacture by melting." A material to be remanufactured must necessarily have previously been manufactured. As used in this section an article which is to be remanufactured does not encompass intermediate forms assumed during processes of manufacture, but rather embraces articles manufactured for a particular end use and subsequently imported into this country to be melted and remanufactured into other articles. In our opinion it does not include alloys made to definite specifications abroad in the form of ingots and imported into this country, such as the instant importations, to be formed into particular consumer articles.

The reasoning of the court in *United Metal* applies with compelling force here and leads us to the conclusion that the claim of plaintiff cannot be sustained. In view of this result, we do not reach the further question concerning compliance with the regulations of the Secretary of the Treasury.

For the foregoing reasons and upon the authorities cited, all claims of plaintiff are overruled and judgment will issue accordingly.