(C.D. 2197)

JOHN V. CARR & SON, INC. *v.* UNITED STATES

## United States Customs Court, Second Division

(Decided August 9, 1960)

*Schmier and Schmier* (*Abe A. Schmier* and *Stephen A. Bromberg*) of counsel for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Daniel I. Auster* and *Richard H. Welsh*, trial attorneys), for the defendants.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Counsel for the respective parties stipulated that the merchandise involved herein consists of certain "hot, flat, rolled steel," a ferrous metal. The four shipments in question consisted of 1,109.066 tons of steel made up into 569 bundles.

Some of the merchandise was classified as steel in strips, thicker than five one-hundredths of 1 inch, but not thicker than one-quarter of 1 inch, and not exceeding 16 inches in width, in paragraph 316(a) of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 316(a)), as modified by the Annecy Protocol to the General Agreement on Tariffs and Trade, 84 Treas. Dec. 403, T.D. 52373, supplemented by Presidential proclamation, 85 Treas. Dec. 116, T.D. 52462, with a duty assessment of 12½ per centum ad valorem.

Another portion of the merchandise was classified as band steel, thinner than 0.109 but not thinner than 0.038 inch, not over 8 inches wide, and valued not over 3 cents per pound, in paragraph 313 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 313), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739, carrying a dutiable rate of 0.175 cent per pound.

The third classification invoked by the collector for some of this merchandise was the provision in paragraph 307 of the Tariff Act of 1930 (19 U.S.C. § 1001, par. 307), as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, *supra*, for plate steel, valued at not over 3 cents per pound, and not thinner than 0.109 inch, cut or sheared to shape or otherwise, with a duty assessment at the rate of 0.175 cent per pound.

Plaintiff claims that the merchandise is entitled to entry free of duty as "metal scrap," within the provision therefor in Public Law 869 of the 81st Congress, 2d session (64 Stat. 1093), as amended, reading as follows:

Sec. 1. (a) No duties or import taxes shall be levied, collected, or payable under the Tariff Act of 1930, as amended, or under section 3425 of the Internal Revenue Code with respect to metal scrap, or relaying and rerolling rails.

(b) The word "scrap", as used in this Act, shall mean all ferrous and nonferrous materials and articles, of which ferrous or nonferrous metal is the

component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured.

At a pretrial conference, counsel for the respective parties agreed that if the merchandise is not properly classifiable as claimed, then it is dutiable as assessed. Hence, the sole question for determination is whether this steel is "metal scrap," within the meaning of that term, as set forth in Public Law 869, *supra.*

The steel in question was manufactured by the Algoma Steel Corp., Ltd., of Sault Ste. Marie, Ontario, Canada, and sold to the Knoll Steel Corp., of Detroit, Mich. While the merchandise was in shipment from the country of exportation to the port of entry, the Knoll Steel Corp. sold the steel to the Lafayette Steel Co. of Detroit. Before delivery of the merchandise to the Lafayette plant, it was sent to the All-Metal Pickling Corp. of Detroit where it was processed. The testimony of the plaintiff's six witnesses follows the merchandise from the plant of the Canadian manufacturer and exporter through its importation by plaintiff on behalf of the Knoll Steel Corp. and to its final disposition by the Lafayette Steel Co., the domestic purchaser of the shipments in question. Following is an outline of the testimony:

Edward Thomson, in charge of the combination bar and strip mill at the plant of the Algoma Steel Corp., Ltd., stated that all of the imported steel was originally made for home consumption in Canada and was sold as "hot rolled strip and hot rolled sheets." Certain portions sold to customers were rejected because the steel was not suitable for welding and also because—

* * * the material basically in some cases was hard, would not make the job for which it was intended. I know the material was off section, and would not meet the tolerances as published, that is the tolerances that we adhere to when we make an order, and there were surface blemishes, such as scratches.

The complaint of one of the customers was explained by the witness as follows:

The complaint was off-section, which is narrow width and off gauge, poor weldability, and excessive hardness, which caused cracking, either in the rolling of the rim stock or in the drawing of the spider, which caused breakage.

After the customers had returned the steel, "there was an inspection program put on the balance of the material at the plant, and at that time the decision was made not to ship it." Following its rejection, either by customers or by plant inspectors, the steel was moved outside the plant where it was exposed to the elements. While there, the witness observed its condition, which he described as "very rusty" and "wavy" due to handling by trucks and cranes that caused the sheets to be bent. Based on his examination of the steel while it was

inside the plant, as well as after its removal outside, the witness testified that it was "defective steel" that could not be supplied to any customer.

James E. Sandvik, another employee of the Algoma Steel Corp. of Canada, who worked in the bar and strip mill of the plant, testified concerning the condition of this merchandise after an order therefor had been received from the Knoll Steel Corp. The witness stated that he was employed as a "flat roll expediter" and that it was his duty to keep complete records with respect to rejected material so that it would be properly identified when it was sold and left the plant. Referring specifically to the transaction that led to the exportation of the present merchandise, the witness stated that, in company with a representative of the Knoll Steel Corp. who came to the Algoma plant for the purpose of obtaining the merchandise in question, he checked over this material, observing its condition, as well as recording the quantity purchased. His testimony concerning the condition of the merchandise at the Algoma plant corroborates the testimony adduced from the previous witness.

When the shipments in question arrived at the port of Detroit, where entry was made, William R. Filbin an employee of plaintiff, a customhouse broker, accompanied Ralph Jackson, a member of the staff of the United States appraiser, to the Detroit Marine Terminal, where they examined one of the bundles containing about 100 sheets of the imported steel and withdrew a sample. Filbin testified that the sheets of steel he saw at that time were rusty and pitted and that he regarded the entire lot as defective merchandise.

As stated above, while the steel in question was being shipped from the plant of the Canadian exporter to the said Knoll Steel Corp., the latter sold all of the merchandise to the Lafayette Steel Co. of Detroit. On arrival of the merchandise at the port of entry, however, Lafayette Steel Co. did not take immediate delivery. Instead, the merchandise was sent to the All-Metal Pickling Corp. of Detroit for pickling and oiling.

Francis F. Muzyka, plant superintendent of the All-Metal Pickling Corp., testified that he received the steel in question and that in his examination of the merchandise, as it was handled for pickling, he found it to be either bowed or badly pitted with water and rust marks, or rusted and corroded. From his observation and handling of the imported merchandise, he "didn't think the material was any good," and, therefore, contacted the Lafayette Steel Co.

Frank Kurdziel, the plant superintendent of the Lafayette Steel Co., testified that he examined this imported steel at the plant of the All-Metal Pickling Corp. before it was subjected to any processing, and that he found it to be bowed, rusty, pitted, and corroded. He

ordered that the steel be pickled in oil and instructed that the material be kept in the tanks longer than usual, expecting that the extraordinary treatment would make the merchandise serviceable.

The All-Metal Pickling Corp. carried out those instructions. The witness Muzyka further testified that the "Normal pickling operation takes 20 minutes," but "This material we had to leave some 45 minutes, and some an hour," with the result that a few sheets were "a little better than what they were, because acid has a tendency of doing that, but I would say not much better, because they will leave pit marks."

After the steel was pickled and oiled, it was sent to the Lafayette Steel Co. The testimony of Kurdziel, the plant superintendent of the concern, described the condition of the merchandise upon its arrival at that plant as follows:

Q. Tell the court what condition the steel was in there.—A. When the material came in here, naturally it was not flat, so I started putting it into a roller leveler. That is one way I found out that it wouldn't go through, and I was wondering why it still was bowed, so I put my micrometer on it, and I found out the material was not true to gauge. On the same sheet the gauge would be a little different than the other end of the sheet. It would probably vary between 20 to 25 thousands. In our gauges we have a certain tolerance for certain gauge.

Q. This was beyond the allowable tolerance, was it?—A. That is correct.

Q. In other words, do I understand you to say that in one sheet of steel you would have several gauges?—A. That is correct, the same sheet.

Q. Go ahead.—A. I couldn't roller level that type of material, so I put it on a "miking" line, and we put two "mikers" on each end of the material, and had to mark off where the gauge changed off, so that involved—we had to put it into the shear, trim the edges and the ends, and wherever the material was marked off, we had to cut it off and put it to one side, and then we went through the roller leveling process.

* * * * * * *

Q. Did you roller level all of the sheets?—A. All the sheets were roller leveled.

Q. Through that process the sheets were flattened out, is that it?—A. That is correct.

Q. Were the inside sheets rusted or pock-marked?—A. Yes, there were a lot of sheets left over there that were pock-marked, and rust was not removed from the steel after it came from the pickler. It was corroded.

Q. Would you tell this court what percentage of all of this steel you were able to make any use of?—A. The percentage was very, very little.

Q. You say the percentage that you were able to use was very little. What happened to the rest of it?—A. The biggest percentage was scrapped.

MR. WELSH: I object to that. What did you do with it?

THE WITNESS: We scrapped it, like the top and bottom sheets we scrapped. After we went through the roller level, after we "miked" it out, that part was scrapped.

JUDGE MOLLISON: What do you do when you scrap something in your plant?

THE WITNESS: We just throw it in the scrap box, and then the truck comes in at night and picks it up.

JUDGE MOLLISON: Whose truck?

THE WITNESS: The scrapyard.

Harry Marrella, the comptroller of the Lafayette Steel Co., testified that the cost of the imported merchandise, which included the purchase price paid to the Knoll Steel Corp., plus transportation, cartage, and processing, was $75.50 and that his company received $21 per ton, f.o.b. Lafayette plant, for the tonnage of scrap acquired from these shipments.

Defendant's sole witness, Edward W. Voigt, the customs examiner at the port of Detroit, stated that he examined two of the four shipments in question. In one of those shipments, he opened five bundles; in the other, three or four bundles. Although he admitted that the steel in question was "secondary" merchandise, he stated that the sheets he examined were "hot rolled sheets or strips" that conformed to the sizes on the invoices for width and gauge, and, so far as could be determined from a visual observation, they were not defective.

Plaintiff, to support its position, relies on the case of *Harry Harris & Co.* v. *United States*, 29 Cust. Ct. 331, C.D. 1488. There, the merchandise consisted of certain surplus war material from England, consisting of steel sheets which in their original form had been galvanized but through the action of atmospheric conditions and other causes the material had lost its commercial identity as galvanized sheets. The court found that the merchandise, in its condition, as imported, was so defective and damaged that it was fit only to be remanufactured, and, therefore held it to be entitled to free entry as metal scrap pursuant to Public Law 869, *supra*. The importance of the cited case to the present discussion is the court's emphasis on the well-established principle that the condition of merchandise at the time of its importation controls its tariff classification. We quote from the decision:

It is apparent from the record before us that at the time of purchase of the material in issue as well as subsequent to its importation into this country, it was the intention to deal in the commodity as steel sheets. When it was realized upon importation that there was not a market for the importation as sheets, the importer went to considerable expense in order to process the merchandise for that purpose. However, the record indicates that the material, even when reconditioned, was too brittle for use as steel sheets and after the cancellation of their orders by the General Motors Co. and the Chrysler Corp., the merchandise was disposed of as "scrap." It is further apparent that the merchandise in the condition as imported was nothing more than scrap fit only to be remanufactured.

Regardless of what might have been the hopes of the importer or what its intentions were at the time of purchase, the test to be applied to classification is what in fact was the merchandise at the time of importation into the United States.

In the case of *The Robert Edwards*, 6 Wheat. 187 (19 U.S. 85), it was stated by the Supreme Court of the United States that "we are not to shut our eyes on circumstances, which sometimes carry with them a conviction, which the most positive testimony will sometimes fail to produce."

From all the facts and circumstances presented by the record before us, we are of the opinion that at the time of importation, the merchandise, the subject of this case, was encompassed by the definition of "scrap" contained in section 1(b) of Public Law 869, *supra*, namely, "all ferrous and nonferrous materials and articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured."

The reasoning employed in the foregoing quotation from the *Harris* case, *supra*, applies with the same force and effect here. Plaintiff's testimony herein is convincing that when the steel in question arrived at the port of entry in the United States it was second-hand, defective merchandise, and fit only to be remanufactured. It had been rejected in the foreign market, either by the manufacturer's own inspectors or by its customers. The defective or damaged condition of this steel, at the time of its importation, is clearly established by the combined testimony of plaintiff's witnesses, showing the necessity for the different processes to which the imported merchandise was subjected, which included flattening, shearing, gauging, pickling, and oiling. That a "very, very little" percentage of this steel was made use of will not prevent classification of all of the shipments as scrap. In its imported condition, it was defective merchandise, fit only to be remanufactured. "What may have been done to the merchandise subsequent to importation in order to put it in a salable condition as steel sheets can have no bearing on its classification." The *Harris* case, *supra*.

The testimony of the customs examiner is not sufficient to disturb the controlling influence of plaintiff's evidence.

Other points raised by counsel in their briefs have been reviewed but are not discussed here since they would have no bearing upon the conclusion reached.

On the basis of the present record and for the reasons above set forth, we hold the steel in question to be classifiable as "metal scrap" within the meaning of that term, as defined in Public Law 869, *supra*, and free of duty thereunder, as claimed by plaintiff.

The protest is sustained and judgment will issue accordingly.