(C.D. 2311)

BORDER BROKERAGE CO. ET AL. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided January 22, 1962)

*Lawrence & Tuttle* (*Edward N. Glad* of counsel) for the plaintiffs.
*William H. Orrick, Jr.,* Assistant Attorney General (*Murray Sklaroff* and *Alfred A. Taylor, Jr.,* trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; LAWRENCE, J., not participating

RAO, Judge: Certain used steel, invoiced as re-rolling steel, was imported into the United States from Canada during the latter half of

1956 and the early part of 1957. In all, there were eight shipments. Part of this merchandise was assessed with duty at the rate of 7½ per centum ad valorem, as structural shapes of iron or steel, advanced beyond casting, hammering, or rolling, as provided in paragraph 312 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas. Dec. 121, T.D. 52739; part at the rate of 0.175 cent per pound as plate steel, not thinner than 0.109 inch and valued at not over 3 cents per pound, within the purview of paragraph 307 of said act, as modified by said Torquay protocol; and the remaining portion was assessed with duty at the rate of 9½ per centum ad valorem, as steel bars, valued over 3½ cents but not over 4 cents per pound, pursuant to the provisions of paragraph 304 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to said General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108.

It is claimed in the instant protests, which have been consolidated for purposes of trial, that the merchandise so classified and assessed with duty is entitled to free entry as metal scrap, fit only to be remanufactured, within the provisions of Public Law 869 of the 81st Congress, 86 Treas. Dec. 27, T.D. 52656, or as extended by Public Law 723 of the 84th Congress, 91 Treas. Dec. 273, T.D. 54147.

With respect to protests 59/14608, 59/14609, and 59/14610, it is further contended that the dutiable liquidations of the six entries to which said protests relate were void as having been made more than 60 days after the merchandise was liquidated free of duty.

The *per se* character of the imported steel as, variously, structural shapes, plate steel, or steel bars, is not immediately in issue in this case. The dispute arises over whether these forms, as imported, were in such condition as to fit the description of Public Law 869, *supra*, for metal scrap.

Public Law 869, *supra*, reads as follows:

Sec. 1. (a) No duties or import taxes shall be levied, collected, or payable under the Tariff Act of 1930, as amended, or under section 3425 of the Internal Revenue Code with respect to metal scrap, or relaying and rerolling rails.

(b) The word "scrap", as used in this Act, shall mean all ferrous and non-ferrous materials and articles, of which ferrous or nonferrous metal is the component material of chief value, which are second-hand or waste or refuse, or are obsolete, defective or damaged, and which are fit only to be remanufactured.

Sec. 2. Articles of which metal is the component material of chief value, other than ores or concentrates of crude metal, imported to be used in remanufacture by melting, shall be accorded entry free of duty and import tax, upon submission of proof, under such regulations and within such time as the Secretary of the Treasury may prescribe, that they have been used in remanufacture by melting: *Provided, however*, That nothing contained in the provisions of this section shall be construed to limit or restrict the exemption granted by section 1 of this Act.

\*         \*         \*         \*         \*         \*         \*

The amendment thereof by Public Law 723, *supra*, provides:

That the first sentence of section 2 of the Act of September 30, 1950 (Public Law 869, Eighty-first Congress), is hereby amended by striking out "June 30, 1956" and inserting in lieu thereof "June 30, 1957": *Provided,* That this Act shall not apply to lead scrap, lead alloy scrap, antimonial lead scrap, scrap battery lead or plates, zinc scrap, or zinc alloy scrap, or to any form of tungsten scrap, tungsten carbide scrap, or tungsten alloy scrap; or to articles of lead, lead alloy, antimonial lead, zinc, or zinc alloy, or to articles of tungsten, tungsten carbide, or tungsten alloy, imported for remanufacture by melting.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

From the official papers, which have been moved in evidence by consent of the parties, it is apparent that the collector's classifications of the instant merchandise stemmed from the examiner's conclusion that it was capable of being used in its condition as imported. The evidence introduced by the plaintiffs was addressed to the proposition that it was not so usable. It was adduced through the testimony of Martin H. Brashem, manager of General Metals of Tacoma, Inc., the ultimate consignee, a firm engaged in the purchase and sale of metal scrap.

Brashem was the only witness in the case. Although he had had only 7 years' experience in the metal scrap business, of which 4½ were spent as manager of General Metals of Tacoma, Inc., and needed to have his recollections of the condition of the steel, as imported, refreshed by the invoice description of the merchandise, it is the opinion of the court that his testimony, which was not controverted, suffices to establish *prima facie* that none of this steel was so-called reusable steel, that is, steel fit for use in its condition as imported.

According to this witness, reusable steel is straight, not too rusty, and "what we call fairly clean from attachments, dirt, etc." He described the subject merchandise, all of which he saw both in Canada at the time of purchase and in the United States at the time of its arrival, as consisting of beams, plates, bars, and many other shapes, sizes, and types of used steel, most of which was rusty and pitted, and, in many instances, in a bent or semicircular form. Some of the I-beams were cut into 4-foot pieces, which he considered too short and rusty for anything but scrap.

The witness stated that the material was purchased at metal scrap prices and, in his opinion, required re-rolling to be of any further value. The re-rolling process, in the language of this witness, consists of the following:

Another type of mill is called a re-rolling mill, in which the steel scrap is cut into pieces approximately four inches wide, and one to three feet in length, and put into a small furnace, heated to a white hot state, and then rolled into a bar, or shape, primarily, or usually into a round bar. The purpose, of course, is to convert old, rusty steel into new steel which can be re-used.

All of the steel to which the instant protests relate was, after importation, exported to Japan under a United States Government export license which specified scrap for re-rolling purposes only. It was the impression of the witness that, under this license, he could not have shipped either usable steel or even scrap for remelting purposes.

The record contains no evidence as to the ultimate actual use of the subject merchandise.

At the conclusion of the trial, the parties entered into the following stipulation:

MR. GLAD: At this time I offer to stipulate that Entries Nos. 05–02410, 05–02374, 05–01729, 05–01746, 05–01664, and 05–01724 were listed on a free entry bulletin as entered, which bulletin was posted in the customs house at Blaine, Washington, on December 20, 1957. These entries are covered by Protests 59/14610, 59/14609, and 59/14608.

I further offer to stipulate that on the face of the foregoing consumption entries, which were available for inspection by the importer, appeared a statement of liquidated duties.

I further offer to stipulate that, however, no demand for supplemental duties were made for customs of the importer of record until April 18, 1958.

And, I further offer to stipulate that, in addition, on April 18, 1958, the aforesaid free entry bulletin, dated December 20, 1957, was canceled, and notice of such cancellation was the posting of the above entries on a dutiable bulletin showing liquidation with increases, on April 18, 1958.

MR. SKLAROFF: Based on information obtained from customs officials, Deputy Collector Dolgner, the Government so stipulates.

We address ourselves first to the contention of counsel for the plaintiffs that the liquidations of April 18, 1958, canceling the liquidations and free entry notices of December 20, 1957, of those entries covered by protests 59/14610, 59/14609, and 59/14608 were null and void.

By the provisions of section 505 of the Tariff Act of 1930, the collector is required to "ascertain, fix, and liquidate the rate and amount of duties to be paid on [entered] merchandise as provided by law and * * * give notice of such liquidation in the form and manner prescribed by the Secretary of the Treasury."

The form and manner of such notice has been specified by the Secretary of the Treasury in section 16.2(d) of the Customs Regulations of 1954, wherein the following is provided:

16.2(d)  After liquidation by the collector, formal entries, except free consumption entries liquidated "As Entered", shall be scheduled promptly on a bulletin notice of liquidation, customs Form 4333. Free consumption entries liquidated "As Entered" shall be scheduled promptly on a bulletin notice of liquidation, customs Form 4335. When free consumption entries in an unbroken series of numbers are liquidated free on the same day, the first and last entry numbers may be shown on the bulletin notice, e.g., "567/863," instead of listing every number in the unbroken series. For the notice of liquidations of appraisement, baggage, informal, and mail entries see section 16.12. The bulletin notice

of liquidation shall be posted as soon as possible in a conspicuous place in the customhouse for the information of importers or lodged at some other suitable place in the customhouse in such a manner that it can readily be located and consulted by all interested persons, who shall be directed to that place by a notice maintained in a conspicuous place in the customhouse stating where notices of liquidation of entries are to be found. The bulletin notice of liquidation shall be dated with the date of posting or, if not posted, with the date it is lodged in the above-described place for the information of importers. The entries for which the bulletin notice of liquidation has been prepared shall be stamped "Liquidated," with the date of liquidation, which shall be the same as the date of the bulletin notice of liquidation. Such stamping shall be deemed the legal evidence of liquidation.

If the collector fails to give notice in the form and manner prescribed by the Secretary of the Treasury, he has not fulfilled his statutory function, and his purported act of liquidation is void. *United States* v. *Astra Bentwood Furniture Co.*, 28 C.C.P.A. (Customs) 205, C.A.D. 147; *United States* v. *Holman, Inc.*, 29 C.C.P.A. (Customs) 3, C.A.D. 164; *Standard Oil Co. of Louisiana* v. *United States*, 33 C.C.P.A. (Customs) 152, C.A.D. 329.

It is apparent from the stipulation of the parties and the official papers that the liquidations of December 20, 1957, of the entries covered by the cited protests were not free as entered. On the contrary, the statements of liquidated duties clearly indicated the collector's decision to assess duties against the merchandise and to disallow the claim for free entry as scrap. Accordingly, when the collector posted notices purporting to show that the involved merchandise had been liquidated free "As Entered," he failed to execute the precepts of the Secretary of the Treasury or to give notice in the form and manner prescribed. Hence, his acts in attempted compliance were without legal effect. Since a liquidation is not final, complete, and valid until the proper requisite notice has been given, it follows that the purported liquidations of December 20, 1957, were void. The involved entries were not then finally liquidated until April 18, 1958, when a proper notice of liquidation was posted for each entry. There was, therefore, no impropriety in the cancellation of the so-called liquidations of December 20, 1957, and the only valid liquidations herein were those of April 18, 1958, which plaintiffs have duly protested.

Although, as hereinabove stated, and as indicated by the foregoing review of the record made in this case, plaintiffs' proof is somewhat weak, and, indeed, rests upon a not too secure foundation of the witness' recollections, it, nevertheless, suffices, standing alone and uncontroverted, to establish, *prima facie*, that the subject steel was scrap fit only to be remanufactured. It must be remembered that no evidence was introduced by the defendant, and the statutory presumption of correctness which attaches to the collector's decision is no substitute therefor, *Marshall Field & Co.* v. *United States*, 20 C.C.P.A. (Customs)

225, T.D. 46037. As stated by this court in the case of *Kroder Reubel Co., Inc.*, and *Alltransport, Inc.* v. *United States*, 44 Cust. Ct. 274, C.D. 2186:

While we are not unmindful of the presumption which attaches to the decision of the collector, nevertheless, a presumption is not evidence and is overcome by a small degree of competent proof.

There is some evidence here from which it may reasonably be inferred that this steel was secondhand and damaged and that before it could be used it had to be heated and rolled. The steel was described as pitted and rusty, sometimes bent, sometimes in pieces cut too short to serve any useful purpose. It was purchased at scrap prices and exported under a license for scrap for re-rolling purposes.

To be sure, the record lacks evidence of actual use, but we do not regard this omission as fatal to the position of plaintiffs, in the light of the proof tending to show that the steel was unfit for use in its imported condition, except to be re-rolled.

It is clear from the description of the operations of a re-rolling mill, that the process therein employed of converting steel scrap into usable steel is a manufacturing process.

Under the statutory definition, metal scrap is material which is "second-hand or waste or refuse, or * * * obsolete, defective or damaged, and * * * fit only to be remanufactured." The law is well settled that the character of metal as scrap is to be determined from its condition as imported. *A. G. Oakleaf et al.* v. *United States*, 33 Treas. Dec. 495, T.D. 37464; *Harry Harris & Co.* v. *United States*, 29 Cust. Ct. 331, C.D. 1488; *John V. Carr & Son, Inc.* v. *United States*, 45 Cust. Ct. 52, C.D. 2197.

It is the contention of the defendant, however, predicated upon a study of the legislative history of Public Law 869 (Senate Report No. 2259, August 9, 1950, to accompany H.R. 5327) that the phrase "fit only to be remanufactured" requires remanufacturing in the United States, and since the subject merchandise was exported to Japan without further processing in this country, it is not entitled to free entry as scrap.

No useful purpose is served in elaborating upon the considerations which prompted Congress to enact Public Law 869, in view of the clear and explicit language it has employed in the law itself to express its intention. The only limitations which it has imposed on the free admission of metal scrap are those which are found in the definition of the word itself in subdivision (b) of section 1 of the act, no portion of which contains a requirement that remanufacturing be performed in the United States. By contrast, section 2 of the law relating to articles in chief value of metal "imported to be used in remanufacture by melting" specifies actual remanufacture by melting, and the submission of proof attesting to such fact, "under such regula-

tions and within such time as the Secretary of the Treasury may prescribe."

The primary function of the court in the construction of a statute is, of course, to ascertain the legislative intent. Where, however, language is as carefully drawn as that here seems to be, and no ambiguity exists, there is little occasion to explore extraneous material to determine its meaning. It seems clear that if Congress had considered it desirable to have required that remanufacture of metal scrap take place in the United States, language to accomplish that purpose could easily have been inserted.

Accordingly, we are of the view that the merchandise at bar consists of metal scrap within the purview of Public Law 869, or its extending amendment, for which free entry is therein provided. The claim for free entry under said public law is, therefore, sustained.

Judgment will be entered accordingly.